

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-23-00010-CV

IN THE INTEREST OF M.M., A CHILD

On Appeal from the County Court at Law
Rusk County, Texas
Trial Court No. 2021-06-210

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice van Cleef

# MEMORANDUM OPINION

M.M. was removed from the care of Mother by the Department of Family and Protective Services after both of them tested positive for amphetamine, benzodiazepine, and syphilis after M.M.'s birth. M.M. was placed with Terry and Bill (collectively Intervenors), who had previously adopted Mother's son, Matt.[1] During the pendency of the case, Intervenors intervened in the case and sought termination of Mother's parental rights and to be named permanent managing conservators of M.M. About one and one-half years after M.M. was removed, a Rusk County jury found by clear and convincing evidence that Mother's parental rights should be terminated and that the termination of her parental rights was in the best interest of M.M. Pursuant to the verdict, the trial court entered an order that terminated Mother's parental rights to M.M. on statutory grounds D, E, and O,[2] named Intervenors permanent managing conservators of M.M., and removed the Department as managing conservator of M.M.[3,4]

In this appeal, Mother asserts that (1) there was legally and factually insufficient evidence to support the jury's findings under grounds D, E, and O, and (2) there was legally and factually insufficient evidence to support the jury's finding that termination of her parental rights was in

---

[1]All minor children, their parents, and their adoptive parents will be referred to either by their initials or by fictitious names. TEX. R. APP. P. 9.8.

[2]*See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O).

[3]The alleged father's parental rights to M.M. were terminated by separate order. The alleged father did not appeal the trial court's judgment.

[4]At trial, the Department did not seek termination of Mother's parental rights but sought to be named sole managing conservator of M.M. if Mother's parental rights were not terminated. The Department does not appeal the trial court's judgment.

the best interest of M.M. Because we find that legally and factually sufficient evidence supported the jury's findings under ground E and that termination of Mother's parental rights was in the best interest of M.M., we affirm the trial court's judgment.

## I.     Standard of Review

"The natural right existing between parents and their children is of constitutional dimensions." *In re E.J.Z.*, 547 S.W.3d 339, 343 (Tex. App.—Texarkana 2018, no pet.) (quoting *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). "Indeed, parents have a fundamental right to make decisions concerning 'the care, custody, and control of their children.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial." *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014)). "This Court is therefore required to 'engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights.'" *Id.* (quoting *In re A.B.*, 437 S.W.3d at 500). "[I]nvoluntary termination statutes are strictly construed in favor of the parent." *Id.* (alteration in original) (quoting *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied)).

"In order to terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest." *Id.* (citing TEX. FAM. CODE ANN. § 161.001; *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012)). "'Clear and convincing evidence' is that 'degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of

the allegations sought to be established.'" *Id.* (quoting TEX. FAM. CODE ANN. § 101.007 (citing *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009)). "This standard of proof necessarily affects our review of the evidence." *Id.*

"In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder reasonably could have formed a firm belief or conviction that the grounds for termination were proven." *In re L.E.S.*, 471 S.W.3d 915, 920 (Tex. App.—Texarkana 2015, no pet.) (citing *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.)). "We assume the . . . fact-finder[] resolved disputed facts in favor of the finding, if a reasonable fact-finder could do so, and disregarded evidence that the fact-finder could have reasonably disbelieved or the credibility of which reasonably could be doubted." *Id.* (citing *In re J.P.B.*, 180 S.W.3d at 573).

"In our review of factual sufficiency, we give due consideration to evidence the [fact-finder] could have reasonably found to be clear and convincing." *Id.* (citing *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam)). Also, we "consider whether disputed evidence is such that a reasonable fact[-]finder could not have resolved that disputed evidence in favor of its finding." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable fact[-]finder could not have credited in favor of the finding is so significant that a fact[-]finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re L.E.S.*, 471 S.W.3d at 920 (quoting *In re J.F.C.*, 96 S.W.3d at 266). "In applying this standard, '[a]n appellate court's review must not be so

4

rigorous that the only fact[-]findings that could withstand review are those established beyond a reasonable doubt.'" *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam) (quoting *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002)).

"'[I]n making this determination,' we undertake "'an exacting review of the entire record with a healthy regard for the constitutional interests at stake."'" *In re L.E.S.*, 471 S.W.3d at 920 (alteration in original) (quoting *In re A.B.*, 437 S.W.3d at 503). We "must nevertheless still provide due deference to the decisions of the fact[-]finder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (citing *In re J.L.*, 163 S.W.3d 79, 86–87 (Tex. 2005)). "We also recognize that . . . the fact-finder[] . . . may believe all, part, or none of a witness' testimony." *In re A.M.*, No. 06-18-00012-CV, 2018 WL 3077784, at *3 (Tex. App.—Texarkana June 22, 2018, pet. denied) (mem. op.) (citing *In re H.R.M.*, 209 S.W.3d at 109).

"Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, "'the rights of natural parents are not absolute; protection of the child is paramount."'" *In re L.E.S.*, 471 S.W.3d at 920 (quoting *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003)). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *Id.* (quoting *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.)).

"Only one predicate finding under Section 161.001[b](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best

5

interest." *Id.* at 923 (quoting *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied)).

> Even so, in *In re N.G.*, the Texas Supreme Court held that due process demands that we review the evidence supporting findings under Grounds D and E when they are challenged on appeal because termination of parental rights under these Grounds "may have implications for . . . parental rights to other children."

*In re L.W.*, 609 S.W.3d 189, 195–96 (Tex. App.—Texarkana 2020, no pet.) (quoting *In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019) (per curiam)). "As a result, we focus our analysis on Grounds D and E." *Id.* at 196.

## II. Sufficient Evidence Supported the Jury's Ground E Finding

### A. Statutory Ground E Requirements

Parental rights may be terminated under ground E "if the court finds by clear and convincing evidence . . . that the parent has . . . engaged in conduct . . . which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). "'[E]ndanger' means to expose to loss or injury; to jeopardize." *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re L.E.S.*, 471 S.W.3d at 923; *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.). "It is not necessary that the conduct be directed at the child or that the child actually suffer injury." *In re L.E.S.*, 471 S.W.3d at 923. "Under subsection (E), it is sufficient that the child's well-being is jeopardized or exposed to loss or injury." *Id.* (citing *Boyd*, 727 S.W.2d at 533; *In re N.S.G.*, 235 S.W.3d at 367). "Further, termination under subsection (E) must be based on more than a single act or omission. Instead, a 'voluntary, deliberate, and conscious course of conduct by the parent is required.'" *Id.* (quoting *Perez v. Tex. Dep't of Protective & Regul. Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso

6

2004, no pet.)); *see Boyd*, 727 S.W.2d at 533; *In re N.S.G.*, 235 S.W.3d at 366–67. Nevertheless, the parent's conduct includes both the parent's acts and its omissions or failures to act. *In re S.K.*, 198 S.W.3d 899, 902 (Tex. App.—Dallas 2006, pet. denied); *In re N.S.G.*, 235 S.W.3d at 366–67.

"[E]ndangering conduct may include the parent's actions before the child's birth, while the parent had custody of older children, including evidence of drug usage." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (citing *Boyd*, 727 S.W.2d at 533). "[C]onduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re J.L.B.*, 349 S.W.3d 836, 848 (Tex. App.—Texarkana 2011, no pet.) (alteration in original). "Drug use and its effect on a parent's life and h[er] ability to parent may establish an endangering course of conduct." *Id.* (quoting *In re N.S.G.*, 235 S.W.3d at 367–68); *see In re J.O.A.*, 283 S.W.3d at 345 n.4; *In re S.N.*, 272 S.W.3d 45, 52 (Tex. App.—Waco 2008, no pet.) ("Evidence of illegal drug use or alcohol abuse by a parent is often cited as conduct which will support an affirmative finding that the parent has engaged in a course of conduct which has the effect of endangering the child."). "Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001(1)(E)." *Walker v. Tex. Dep't Fam. & Protective Servs.*, 312 S.W.3d 608, 617–18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing *Vasquez v. Tex. Dep't Protective & Regul. Servs.*, 190 S.W.3d 189, 195–96 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ("terminating parental rights despite there being no direct evidence of parent's continued drug use actually injuring child")). Also, "intentional criminal activity which expose[s] the parent to

incarceration is relevant evidence tending to establish a course of conduct endangering the emotional and physical well-being of the child.'" *In re L.E.S.*, 471 S.W.3d at 923 (quoting *In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.) (per curiam)). Further, "[i]n our analysis under ground E, we may also consider a parent's failure to complete relevant requirements of h[er] service plan." *In re S.A.W.*, No. 06-21-00116-CV, 2022 WL 1193667, at *4 (Tex. App.—Texarkana Apr. 22, 2022, pet. denied) (mem. op.) (citing *In re Z.J.*, No. 02-19-00118-CV, 2019 WL 6205252, at *11 (Tex. App.—Fort Worth Nov. 21, 2019, pet. denied) (mem. op.)).

### B. The Evidence at Trial Relevant to Ground E

#### 1. Mother's Prior Terminations, Substance Abuse, Domestic Violence, and Criminal History

The evidence showed that Mother did not have custody of her five other minor children and that her parental rights to three of them had been terminated. Her oldest son, James, lived with his father permanently since 2012. Also since 2012, the children's paternal grandparents had custody of her second son, Jerry, and her oldest daughter, Jasmine. Mother testified that her parental rights to Jasmine were terminated in April 2012, while she was incarcerated, and that Jasmine's paternal grandparents adopted her. Mother's second daughter, Gina, was removed by the Department when she was eight months old.[5] Eventually, Mother relinquished her parental rights to Gina, and Gina was adopted. Her youngest son, Matt, was removed when he was six months old and was placed with Intervenors. Her parental rights to Matt were also terminated.

---

[5]At the time of trial, Gina was six years old.

8

M.M. was removed from Mother's care while she was in the neonatal intensive care unit and placed with Intervenors in June 2021, when she was about two weeks old.

Mother's repeated involvement with the Department was intertwined with her long criminal and substance abuse history. In 2009, the Department opened a case for neglectful supervision of James and Jerry based on alcohol use and domestic violence. At the trial of this case, Mother admitted that there had been domestic violence between her partner and her. At the time, James was four years old and Jerry was two years old. She voluntarily placed Jerry with his paternal aunt and James with his father so that she could work services offered by the Department. She remembered that she participated in parenting classes and had treatment because she tested positive for methamphetamine.

Mother admitted that she pled guilty to the assault of her partner in October 2009, for which she was placed on community supervision. Less than one year later, Mother pled guilty to her first driving while intoxicated (DWI) charge and received a sentence of forty-five days in jail. In May 2012, Mother was charged with assault on a public servant and was sentenced to three years in prison. Mother received her second DWI in November 2012 and was sentenced to 330 days, which ran concurrently with her three-year prison sentence. Mother was released from prison on January 1, 2014. On November 1, 2017, Mother was arrested for her third DWI, a third-degree felony. In May 2018, Mother pled guilty and was sentenced to ten years' imprisonment. That sentence was suspended, and she was placed on ten years' community supervision.

Mother acknowledged that the conditions of her community supervision included abstaining from the possession or use of alcoholic beverages and controlled substances and submitting to drug tests when requested. She also acknowledged that she was required to take a DWI repeat-offender class but admitted that she had not taken it. Mother also testified that she was required to attend Walker House rehabilitation for six months. She explained that that was a sober living community with ten women and that the program included classes and random drug testing. In April 2019, Mother was charged with criminal mischief and sentenced to 110 days in jail.

Also in 2019, the State filed a motion to revoke Mother's community supervision because she had tested positive for methamphetamine[6] and because she had been charged with criminal mischief and falsifying a police report. At the hearing on the motion, Mother's conditions of community supervision were amended to require her to attend an Intermediate Sanction Facility (ISF) for six months. She explained that ISF was a prison-based boot camp that included cognitive intervention classes for three months, to retrain thinking, and then substance abuse classes for three months. Although Mother completed the cognitive track of ISF on April 16, 2020, the substance-abuse track was subsequently waived. She testified that she was in jail for a total of one year after she was arrested on the motion to revoke. Mother admitted that she had violated her community supervision again when she tested positive for alcohol during the pendency of this case, but the State did not arrest her or file a new motion to revoke her community supervision.

---

[6]Mother maintained that she last used methamphetamine in May 2019.

The Department removed Gina from Mother's care in 2016 because of domestic violence between Mother and Gina's father, Chuck, and because of methamphetamine use by them. At the time, Mother was not married to Chuck.[7] Mother and Chuck both admitted to domestic violence and to the use of methamphetamine. Mother participated in parenting classes, substance-abuse counseling, and thirty days inpatient substance-abuse treatment at Nexus Recovery Center in Dallas during that case. Mother testified that she worked the services required by the Department and that eventually she received four-hour, unsupervised visits with Gina. Also during that case, Matt was born in May 2017. Then Mother was arrested for her third DWI and went to jail. Eventually, Mother executed a voluntary relinquishment of her parental rights, and the State terminated her parental rights to Gina. Mother asserted that she voluntarily relinquished her rights to Gina because she did not think she could take care of Gina[8] and Matt with a "psycho husband" who was in prison.

After her arrest, Matt was removed from Mother's care.[9] Mother was released from jail after about a month and again began working the services required by the Department. She again took parenting classes, had counseling, had outpatient substance-abuse treatment with Community Healthcore, and attended AA/NA meetings. Mother performed those services while she was at Walker House as required by her community supervision. Eventually, Mother received four-hour, unsupervised visits with Matt. During most of that time, Chuck was in

---

[7]Mother testified that she married Chuck sometime during the pendency of Gina's case, but she could not remember the year.

[8]Gina is disabled.

[9]Chuck is also Matt's biological father.

11

prison, but he was released about the end of September 2018. Shortly after that, Mother stopped working her services and ended all contact with the Department. She claimed that Chuck would not let her visit Matt, that he disabled her car, and that she stopped visiting Matt and going to court to protect him. The State terminated her parental rights to Matt, and Intervenors adopted him.

Mother testified that she had been a victim of assaults by Chuck during their relationship. She was with him when he was not in prison from 2015 through 2018. She testified that Chuck was not around when she was given unsupervised visits, when M.M. was born, or when she relinquished her parental rights to Gina. Mother testified that she was excited when she heard that Chuck was released from prison in September 2018. However, she also testified that the news "did something to [her] mentally" because she knew he would not stop terrorizing her. She testified that Chuck continued to abuse her for eight or nine months after Matt's case, until he was arrested. Chuck was incarcerated from May 2019 until June 2022. In May 2020, Mother sent money to Chuck while he was imprisoned. Apparently, a few months later, Mother got pregnant with M.M. during a short affair with Chuck's friend, Michael. Mother divorced Chuck about a month before the final hearing in this case and obtained a protective order against him.

### 2. Prenatal Care, M.M.'s Birth, and the Hospital Stay

While pregnant with M.M., Mother had six prenatal examinations, with the first on December 18, a few in January, nothing between January 29 and April 16, and her last one on May 14, when she was diagnosed with syphilis. Dr. Tiffany Taylor, who treated M.M. at the hospital, opined that that would be considered inadequate prenatal care.

12

Shortly after the birth of M.M. on May 20, 2021, both Mother and M.M. tested positive for amphetamine, benzodiazepine, and syphilis. M.M. also tested positive for opiates. As a result, and because of Mother's history with the Department, M.M. was removed from Mother's care. While at the hospital, Mother told the Department's investigator that she took Xanax and Ritalin.[10] Dr. Taylor testified that amphetamine is contained in ADHD medications, such as Ritalin, and that benzodiazepines, such as Xanax, are commonly used to treat mothers who have anxiety or depression. Dr. Taylor also testified that, when she reviewed the State of Texas's prescription drug monitoring program, it showed that Mother had been prescribed Ritalin and Xanax by Dr. Mercer. She opined that there was not enough evidence to say whether amphetamine is safe during pregnancy but explained that, if a mother needs it to treat anxiety, it will be continued during pregnancy for the safety of the mother and baby.

Dr. Taylor explained that M.M. was admitted to the neonatal intensive care unit because she had trouble with her breathing because of meconium aspiration[11] and needed to be intubated. Before M.M. was intubated, she was given morphine to decrease the pain and discomfort of the intubation. Dr. Taylor opined that the opiates found in M.M. could have been from that treatment. However, Dr. Taylor testified that the amphetamine and benzodiazepine found in M.M. came from Mother. When M.M. was five days old, the hospital began treatment for neonatal abstinence syndrome because she was withdrawing from the drugs that came from Mother. Dr. Taylor explained that, since amphetamine is out of a newborn's system in about

---

[10]At trial, Mother testified that she had been diagnosed with bipolar disorder, social anxiety disorder, and ADHD and that, at the time of trial, she took medications for ADHD and bipolar disorder.

[11]Dr. Taylor explained that meconium aspiration can happen in any birth if the baby is stressed before birth.

13

forty-eight hours and M.M. did not show symptoms of withdrawal until she was five days old, the cause was the benzodiazepine. M.M. was treated with phenobarbital for the remainder of her stay at the hospital and for six to eight weeks after she was released into the care of Intervenors. Dr. Taylor was not aware of any long-term effects of the phenobarbital treatment. M.M. was also treated with penicillin for ten days, which cured the syphilis infection.

### 3. Mother's Conduct During this Case

#### a. Addressing Parenting Skills

At the June 28, 2021, adversary hearing, the trial court appointed the Department temporary managing conservator of M.M. and ordered Mother to comply with each requirement of the Department's original or any amended family plan. Under the family plan, because of Mother's history with the Department and not raising her other children, Mother was required to complete a parenting class and to participate in individual counseling to further address parenting. Mother completed a parenting class at New Life Church. She described the class as teaching very basic skills that she already knew, such as how to change a diaper. Although she claimed that she also learned some new things, she could not describe what those were. Mother had six or eight individual counseling sessions with Stenet Frost that focused on her coping skills in anticipation of being reunited with M.M.

#### b. Addressing Substance Abuse

Also under the family plan, because of her history with illegal drugs, Mother was required to complete a substance-abuse assessment with Jessica Mitchell, LCDC,[12] be open and

---

[12]Licensed chemical dependency counselor.

honest in her assessment, and follow all recommendations made by Mitchell. The family plan also required Mother to abstain from the use of alcohol and to follow all rules and regulations of all of her community supervision. Mother was also required to "be honest, at all times, with the Court, the caseworker and all service providers."

Mother's initial assessment was on September 13, 2021. Based on Mother's answers to questions in the assessment, she did not meet the criteria for substance-use problems within a twelve-month period. However, Mitchell noted that, even though Mother did not meet the criteria for substance use for the twelve months preceding the assessment, "[a]lcohol abuse may be considered" and that it was "possible [Mother had] not [been] completely honest during the assessment to avoid meeting criteria for services." Mitchell recommended that Mother have random drug and alcohol tests, as well as regular testing to ensure her sobriety. She further recommended that Mother "participate in substance abuse counseling" if she had a positive drug or alcohol test and have "intensive outpatient if [there was] more than one . . . positive test." She explained that intensive outpatient counseling would include both individual counseling and group therapy. Also, Mitchell recommended that Mother participate in AA/NA or sober recovery, "obtain a sponsor and work the 12 steps of recovery," and "participate in parenting classes to better understand how addiction can be traumatic for kids living with substance users."

The Department started monthly random alcohol testing on Mother in November 2021. When the Department tested Mother for alcohol, apparently for the first time, on November 30, 2021, the test was positive. When her caseworker, Haley Weaver, confronted her with the results on December 8, Mother told her that she had gone out with her sister, Randi, to celebrate

15

her birthday and had a drink. At trial, Mother testified that she had a big margarita with an extra shot of tequila. She also testified that she drank it even though she knew she could lose her freedom[13] and her rights[14] to M.M. Mother also admitted that she was not going to tell the Department she had consumed alcohol if the test came back negative.

Even though Mitchell recommended that Mother participate in substance-abuse counseling after she tested positive for alcohol or drugs,[15] it is undisputed that the only counseling Mother participated in after her first positive alcohol test was with Frost. She counseled with Frost from January until July 2022. However, Frost testified that she is not a substance-abuse counselor.[16] Apparently, the Department required Mother to attend AA/NA, as recommended by Mitchell, and to turn in sign-in sheets to verify her attendance. However, several of those sheets were signed by Mother's sister, who accompanied Mother to the AA meetings for support. Mitchell testified that that was concerning because the chair member of the meeting usually signed the sheets and because Mother drank alcohol when she was out with that sister. In addition, although Mother claimed to have a sponsor, there was no evidence that she worked the twelve steps of recovery.

---

[13]Mother testified that a condition of her community supervision was to abstain from the use of alcoholic beverages and that, if she violated that condition, her community supervision could be revoked.

[14]Mother testified that she knew from the beginning of the case that drinking alcohol was a violation of both her family plan and her community supervision.

[15]Except for the drug tests taken in the hospital after giving birth to M.M., Mother did not have any positive tests for substances, other than alcohol, that were not associated with her prescription medications.

[16]Frost testified that Mother had coping skills before she came to her and characterized their sessions as trying to enhance those skills and get a positive result.

In mid-May 2022, Mother was given four hours of unsupervised visitation with M.M. each week. Around June 28, 2022, Mother again drank alcohol. Mother testified that she had a panic attack and was stressed over an upcoming court hearing, "pulled into Daiquiri Express and got a big ol' drink[,] and went home and drank it."[17] She testified that she did not think about the consequences. On June 29, Mother again tested positive for alcohol. Before the results of the test were known,[18] Mother had an unsupervised visit with M.M. on June 30 and a court hearing in this case on July 1. At the hearing, several witnesses testified that Mother had been clean and sober since November 30, 2021, yet Mother never volunteered that the testimony was not true. Rather, Mother did not disclose that she had consumed alcohol again until after Weaver received the results. Weaver agreed that Mother's consumption of alcohol was significant in this case because of her history with alcohol and because she could go to prison for violating her community supervision. Mother testified that she did not tell anyone that she drank alcohol because she hoped not to get caught. She maintained that the only time she drank alcohol during the case was the two times she got caught.

Because of her positive test, Mother was sent for another substance-abuse assessment with Kevin Jordan at East Texas Council on Alcoholism and Drug Abuse (ETCADA) on July 21. According to Jordan's assessment, Mother told him that "she [drank] alcohol," but not on a daily basis, and that she was sober but "had a moment of weakness and had one daiquiri . . . in 2022." She also told him that "[t]he last 12 months, she tried to cut down alcohol and drug use and

---

[17]Mother testified that she did not drink the daiquiri on the way home because she had an Intoxalock machine on her car, and she did not "want a 50-year sentence for another DWI."

[18]Weaver was not aware of the results until around July 18.

17

wasn't able to do it. And continued the drinking to avoid withdrawals or from getting sick from the alcohol or drugs." Jordan was concerned that Mother was minimizing the severity of her substance disorder because of the Department's report and her two prior assessments with ETCADA.[19] He felt that she had an ongoing pattern with alcohol and drug abuse and that she minimized her use of alcohol and drugs and the effects they had on her life and her family's lives. Jordan referred Mother to the Hughes Center for outpatient treatment.

Brent Tanksley, an LCDC counselor with Hughes Center, testified that he had sixteen weekly counseling sessions with Mother. He did not meet Mother in person, and his sessions, which lasted from a few minutes to over an hour, had all been telephonic, except one Zoom session. Tanksley based his assessment of Mother's credibility and truthfulness solely on the tone of her voice, her inflection, and her wording.

In his opinion, Mother made progress during their counseling because she had a structured life and goals and because of the way she interacted with people. He also agreed that Mother had improved from her previous cases with the Department because this case did not involve methamphetamine and she only tested positive for alcohol two times.

While he thought Mother drinking alcohol while on community supervision for DWI was concerning, he did not view her two episodes of drinking several months apart as a pattern. He did not think Mother minimized the severity of her disorder with him. He also believed Mother was very genuine.

---

[19]Mother had substance-abuse assessments by ETCADA during the Department's cases involving Gina and Matt.

Nevertheless, Tanksley acknowledged that ninety-five to ninety-nine percent of people with addictions fall back into it. He opined that, when an addiction disorder is active, even when the person is on community supervision, the ability of the brain to weigh out consequences is impossible. He agreed that, if Mother testified that when she chose to drink in June, she "didn't even think past the very moment," it could mean that she had an active disorder. He also agreed that he could not predict whether Mother would go back to her old patterns.

Mother credited her time at ISF as the turning point in her life and credited it with changing her relationship with her children. She explained that, because of ISF, she was able to hold herself accountable after she drank alcohol in November and not continue drinking. Mother testified that, before ISF, she drank alcohol weekly and that, after ISF, she drank every six months. She asserted that she would not drink again because she would apply her coping skills, such as deep breathing and positive self-talk. Although she admitted that she had those coping skills in November and June when she chose to drink, she asserted that the next time she was tempted to drink, she would remember that she did not want to disappoint her children and would keep calling people until she reached one.

### c. Addressing Domestic Violence

Because of Mother's history of toxic relationships and domestic violence, the family plan required Mother to "participate in a domestic violence class and be able to explain and demonstrate what she ha[d] learned about relationships and what constitute[d] a healthy relationship." It is undisputed that Mother completed a domestic violence class at East Texas Women's Center. There was no direct testimony from Mother regarding what she learned from

that class or what constituted a healthy relationship. Mother testified that she had an advocate at the Center that would help her if she needed assistance with housing, rent, or utilities and that the Center had resources for domestic violence victims. She also testified that, since ISF, she did not have anything to do with people from her abusive past and that she had replaced toxic people with non-toxic people.

Mother also testified that she would be able to take care of M.M. because Chuck was no longer in her life. She did not have the fear of him getting out of jail, controlling her, stealing from her, and abusing her. She said that she would not allow that kind of abuse in her life and that she had set boundaries.

### C.    Analysis

In contending that the evidence is factually and legally insufficient to support the jury's finding under ground E, Mother discounts her prior history with substance abuse, domestic violence, three DWI convictions, and the termination of her parental rights to three of her other children with a cursory assertion that "the history in other [Department] cases is not determinative of a finding under [ground E]." While not necessarily determinative, "endangering conduct may include the parent's actions before the child's birth, while the parent had custody of older children." *In re J.O.A.*, 283 S.W.3d at 345. For that reason, the history may support a finding under ground E. Further, the jury could consider the history when considering the importance of Mother's actions in this case.

For instance, in her brief, Mother attempts to minimize the two instances when she chose to drink alcohol. To be sure, as Mother points out, Tanksley and some of her other providers

20

were not concerned about those instances of alcohol use. However, another provider opined that her decision to drink was a serious relapse in thinking because it could spiral out of control, and, in Mother's case, it might mean her community supervision would be revoked and her parental rights terminated. Also, although Tara Beck, a Court Appointed Special Advocate supervisor, did not think her drinking justified the termination of Mother's rights, she acknowledged that, because Mother could go to prison because of it, Mother exhibited very bad judgment.

A reasonable jury could resolve that testimony in favor of its ground E finding and consider that the following evidence established an endangering course of conduct by Mother: (1) her history of substance abuse, (2) her three DWI convictions, (3) the fact that she received her last DWI during Gina's case with the Department, which led to the termination of her parental rights to Gina and Matt's removal by the Department, (4) Mother's testimony that she drank either because it was her birthday or because she was stressed, and (5) her willingness to have a drink even though she knew that it could result in her going to prison and having her parental rights to M.M. terminated.

In addition, the evidence showed that Mother failed to complete the relevant requirements of her family plan. Although Mother's abuse of alcohol and other substances was a major concern, both Mitchell and Jordan expressed concerns that Mother was not honest with them in her substance-abuse assessment. Mother was also not honest with her caseworker, her providers, or the trial court when she used alcohol, but hid her use until she was confronted by her caseworker. Although Mother was required to follow the recommendations in the assessments, she did not participate in substance-abuse counseling after her positive test in

21

November, she failed to take a parenting class to learn how substance abuse could be traumatic to her children, and she provided no evidence that she had worked a twelve-step recovery, as recommended by Mitchell. This evidence would also support the jury's finding under ground E.

While Mother worked most of her services, she did the same in both Gina's and Matt's cases. In both of those cases, Mother had substance-abuse assessments, participated in counseling and treatment, and worked herself up to four-hour visitations. Yet, in Gina's case, Mother received her third DWI, and in Matt's case, she returned to an abusive relationship. The jury could have been convinced that Mother's working some services, while failing to work other services designed to address those issues, as well as her poor judgment in using alcohol, were part of the same pattern exhibited in Gina's and Matt's cases.

Based on this record, we find that legally and factually sufficient evidence supported the jury's finding under statutory ground E. We overrule this issue. Because we find that sufficient evidence supported the jury's finding under statutory ground E, we need not address the challenges to its findings under grounds D and O. *In re M.H.*, No. 06-22-00072-CV, 2023 WL 2711127, at *6 (Tex. App.—Texarkana Mar. 30, 2023, pet. denied) (mem. op.) (citing *J.T. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-21-00070-CV, 2021 WL 2672055, at *9 (Tex. App.—Austin June 30, 2021, no pet.) (mem. op.)

## III. Sufficient Evidence Supported the Jury's Best-Interest Finding

### A. Best-Interest Requirements

Mother also challenges the factual and legal sufficiency of the evidence supporting the jury's best-interest finding. "There is a strong presumption that keeping a child with a parent is

22

in the child's best interest." *In re R.W.*, 627 S.W.3d 501, 516 (Tex. App.—Texarkana 2021, no pet.) (quoting *In re J.A.S., Jr.*, No. 13-12-00612-CV, 2013 WL 782692, at *7 (Tex. App.—Corpus Christi Feb. 28, 2013, pet. denied) (mem. op.)). "Termination '"can never be justified without the most solid and substantial reasons."'" *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)).

> In determining the best interests of the child, courts consider the following *Holley* factors:
>
> (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*Id.* at 818–19 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *see In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *see also* TEX. FAM. CODE ANN. § 263.307(b). These factors are not exhaustive, and there is no requirement that all of them be proven to terminate parental rights. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Further, we may consider evidence used to support the grounds for termination of parental rights in the best-interest analysis. *See id.* at 28.

## B. Analysis

M.M. was seventeen months old at the time of trial and too young to express her desires. The evidence showed that she had lived all her life with Intervenors, that she was bonded with them and their adopted children, including one of M.M.'s adopted siblings, and that she was happy in their home. Although M.M. spent far less time with Mother, the evidence also showed that M.M. was bonded with Mother and Mother's grandfather. This *Holley* factor is neutral.

23

The evidence showed that Intervenors were addressing M.M.'s emotional, physical, and medical needs. It was undisputed that Intervenors provided M.M. with food, shelter, a loving family, and a safe home. The evidence also showed that Mother had adequate resources to provide for M.M. and that she made improvements to her residence to make it safe for M.M. Because M.M. had balance issues, Intervenors took her to a pediatric neurologist, who diagnosed her with cerebral palsy. Terry testified that M.M.'s left leg seemed weaker, that her left foot turned in, and that she fell a lot. In addition to regular visits with the neurologist, they took her to a physical therapist weekly and to Brain Gym[20] to address issues related to her diagnosis. Mother never attended any of M.M.'s doctor visits, never asked to attend one, and did not know the names of her doctors. She did not know what treatments were required for M.M.'s medical conditions and testified that M.M. did not have any chronic illness. Although Mother had a copy of M.M.'s medical records, she did not read all of them. She heard that there was a possibility of cerebral palsy and that M.M. had therapy, but she did not see anything unusual when M.M. was with her. During the case, Mother did not voluntarily provide any money to support M.M., although she bought her a pair of tennis shoes and some formula. Because Mother did not appear to notice M.M.'s physical problems and appeared to take little interest in her medical needs, the second *Holley* factor weighs in favor of termination.[21]

---

[20]Terry described Brain Gym as retraining the brain by utilizing different exercises and play therapy.

[21]In her brief, Mother points to some of Terry's testimony to argue that Intervenors elevated their own needs above M.M.'s emotional needs and did not consider M.M.'s best interest. However, an examination of the entirety of Terry's and Bill's testimony showed that they had considered the different options that were presented to the jury, consistently testified why they thought termination of Mother's rights was in the best interest of M.M., and did not elevate their own needs above M.M.'s.

Mother attended almost all of her visitations with M.M., and for the most part, her interactions with M.M. were appropriate. Mother also had adequate resources to provide for M.M. and maintained a safe residence for M.M. However, as has been noted, Mother demonstrated that, even though she knew that drinking alcohol was a violation of her community supervision that could result in her imprisonment and that it was a violation of her family plan that could threaten her rights to M.M., she placed her desires above the needs of M.M. and drank alcohol on at least two occasions. She also candidly admitted that, even though she was required to be honest with the Department, her providers, and the trial court, she would not have disclosed those instances of alcohol use had she not been caught by the random alcohol tests. Further, as noted above, although her abuse of alcohol and other substances and domestic violence had resulted in the termination of her parental rights to several of her other children, in her incarceration, and in the removal of M.M., she failed to participate in all of the services that were required to address those issues. Mother sought to reassure the jury that she would not drink again because she would use her coping skills and her support network, yet also acknowledged that she had both coping skills and a support network before the two instances and chose to drink rather than use them. The only excuses she offered for those acts were that she wanted to celebrate her birthday and that she had had a stressful day. We find that the fourth and seventh *Holley* factors are neutral but that the third, eighth, and ninth *Holley* factors weigh in favor of termination.

25

After reviewing the entire record, we find that factually and legally sufficient evidence supported the jury's finding that termination of Mother's parental rights was in the best interest of M.M. We overrule this issue.

## IV. Disposition

For the reasons stated, we affirm the trial court's judgment terminating Mother's parental rights to M.M.

Charles van Cleef
Justice

Date Submitted:     July 20, 2023
Date Decided:      August 14, 2023